UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| UNITED STATES OF AMERICA,         ) | |
| )   | |
| PLAINTIFF,         ) | |
| )   | Case No. _____ |
| v.         ) | |
| )   | Judge_____ |
| CMS Energy Corporation, CMS Land Company,   ) | |
| CMS Capital, L.L.C., Bay Harbor Company,   ) | |
| L.L.C., and Bay Harbor Golf Club, Inc.         ) | |
| )   | |
| DEFENDANTS.         ) | |
| _____ ) | |

**COMPLAINT**

The United States of America, through the undersigned attorneys, by authority of the Attorney General of the United States, acting at the request and on behalf of the United States Environmental Protection Agency ("EPA"), alleges as follows:

NATURE OF THE ACTION

1.      This is a civil action against the above-named defendants (collectively, the "Defendants") pursuant to Section 107 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") as amended, 42 U.S.C. § 9607, for the recovery of costs incurred by the United States in response to the release and threatened release of hazardous substances from facilities at and near the Little Traverse Bay CKD Release Site (the "Site"), located in Resort Township, Emmet County, Michigan.  The United States also seeks a declaratory judgment establishing that Defendants are liable for future response costs that the United States may incur in connection with response actions that may be performed at the Site, pursuant to CERCLA Section 113(g)(2), 42 U.S.C. § 9613(g)(2), and the Declaratory Judgment Act.

JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action and the parties hereto, pursuant to Section 113(b) and (e) of CERCLA, 42 U.S.C. § 9613(b) and (e), and 28 U.S.C. §§ 1331 and 1345.

3. Venue is proper in this district pursuant to Section 113(b) of CERCLA, 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) and (c), because the claims arose and the releases and threatened releases of hazardous substances that gives rise to the United States' claims have occurred in this district.

DEFENDANTS

4. CMS Energy Corporation ("CMS Energy") is incorporated in the State of Michigan, and has its principal place of business in Jackson, Michigan.

5. CMS Land Company ("CMS Land") is incorporated in the State of Michigan, is a wholly owned subsidiary of CMS Capital L.L.C., and has its principal place of business in Jackson, Michigan.

6. CMS Capital Corporation ("CMS Capital"), which was a Michigan corporation, was merged into CMS Capital I, L.L.C., on September 1, 2001, a Michigan limited liability company. On the same date, CMS Capital I, L.L.C. changed its name to CMS Capital, L.L.C. (also, "CMS Capital"). All liabilities of CMS Capital Corporation incurred in connection with the Site are liabilities of CMS Capital, L.L.C. CMS Capital, L.L.C. is a wholly owned subsidiary of CMS Energy.

7. Bay Harbor Company, L.L.C. ("Bay Harbor Company") is a Michigan limited liability company, whose principal place of business is located in Petoskey, Michigan.

8.    Bay Harbor Golf Club, Inc. ("Bay Harbor Golf Club"), formerly known as JAKS, Inc., is a Michigan corporation with its principal place of business in Petoskey, Michigan.

## GENERAL ALLEGATIONS REGARDING THE SITE

9.    The Site occupies approximately 1000 acres, including five miles of shoreline at the Little Traverse Bay, in Resort Township, Michigan.

10.   From 1902 or earlier until at least 1980, limestone and shale quarries and a cement manufacturing plant operated at the Site by companies no longer in existence. The cement manufacturing activities resulted in the creation of four large piles of waste cement kiln dust ("CKD") at the Site.

11.   CKD at the Site contains arsenic, barium, cadmium, chromium, copper, lead, mercury, nickel, selenium, silver, and zinc, all CERCLA hazardous substances identified at 40 C.F.R. § 302.4.

12.   When precipitation and groundwater contact the CKD piles, contaminants from the CKD create a hazardous leachate ("CKD leachate") that has migrated into groundwater or surface water, and into locations on shore or in the Little Traverse Bay and Lake Michigan. Sampling and analysis of the CKD leachate showed pH levels as high as 13.2 standard units, acute toxicity, and concentrations of arsenic, copper, mercury, molybdenum, nickel, selenium, vanadium, and zinc exceeding Michigan's water quality standards. CKD leachate was released at the Site, including onto the shoreline and into portions of Little Traverse Bay and Lake Michigan, since at least 1988.

13.   The Defendants were involved in the development of the Site in the mid-1990s as a luxury residential, commercial, and recreational community, known as Bay Harbor. The development includes a 27-hole golf course, a hotel, an artificial lake and marina, and luxury

homes. The eastern portion of the Site was developed into a public park known as East Park. Portions of the golf course and East Park were built over the CKD piles and portions of the CKD piles were reshaped and moved in order to, among other things, prevent erosion and accommodate landscaping design, including the design of the golf course.

14. In conjunction with the development of the Site, on July 11, 1994, Bay Harbor Company, CMS Land, CMS Capital, Bay Harbor Golf Club, and Boyne USA, Inc. ("Boyne") (the parent corporation of Bay Harbor Golf Club), entered into an Administrative Agreement and Covenant Not to Sue ("MDNR AA") with the Michigan Department of Natural Resources, whose functions with respect to this civil action have been transferred to the Michigan Department of Environmental Quality (collectively, "MDEQ").  (The parties to the MDEQ AA, except for MDEQ, will be referred to as the "MDNR AA Respondents.")

15. The MDNR AA addressed conditions at most of the Site. The MDNR AA required the MDNR AA Respondents to undertake certain activities at the Site to address the presence and release of hazardous substances from one of the CKD piles, and to conduct groundwater monitoring. The MDNR AA allowed the shaping and contouring of the CKD piles to accommodate the landscape design for the golf course, but required certain steps to be taken to reduce exposure of CKD to the air and water. A collection trench system was to be placed near the base of the largest CKD pile at the western part of the Site to intercept leachate generated from that CKD pile. Seepage from the collection system was to be transported to a facility for on-site or off-site treatment, or to a lined retention basin where it was to be reused or discharged as appropriate. The hazardous substances encountered in the construction of improvements at the Site were to be characterized, handled, and disposed of in accordance with Michigan law.

16. On July 14, 1994, Holcim (US), Inc. ("Holcim"), formerly known as Holnam Inc., a Delaware corporation and the owner of the Site from approximately 1980 until 1994, quitclaimed most of the Site property to Bay Harbor Company.

17. Also on July 14, 1994, CMS Capital quitclaimed the remainder of the Site property to Bay Harbor Company, making Bay Harbor Company the owner of the entire Site at that time.

18. Following the execution of the MDNR AA, in July 1994, Bay Harbor Company began redevelopment of the Site. Bay Harbor Company and Bay Harbor Golf Club built a portion of the golf course encompassing eight holes over the three western CKD piles. The construction of the golf course included moving substantial amounts of CKD material, including material from some CKD piles onto others to accommodate the golf course design and to provide for the construction of road grades. Bay Harbor Company also constructed a public park over the eastern CKD pile.

19. Following the execution of the MDNR AA, the MDNR AA Respondents constructed trenches to collect and transport the hazardous leachate associated with the largest CKD pile, which was on the western side of the Site, for off-site treatment. No collection system was built for leachate associated with the other CKD piles at the Site.

20. On September 19, 1995, Bay Harbor Company conveyed, by warranty deed, property at the Site that was to become the golf course to Bay Harbor Golf Club.

21. On December 6, 1995, Bay Harbor Company conveyed a portion of the Site that included the East Park property to Emmet County, Michigan. On July 17, 1996, Emmet County conveyed the East Park property to Resort Township.

22. Operating under a Nondomestic User Discharge Permit ("Pretreatment Permit"), issued on June 4, 1998 by the City of Petoskey, Michigan, Bay Harbor Company and or/ CMS Land, CMS Capital, and CMS Energy transported CKD leachate to the Petoskey wastewater treatment plant. On January 31, 2002, in an administrative consent order (the "Petoskey Pretreatment Order"), the City of Petoskey alleged that Bay Harbor Company exceeded effluent limitations for pH, mercury, arsenic, cadmium copper, and lead, and failed to sample and submit self-monitoring reports as required by the Pretreatment Permit and City ordinance. The Petoskey Pretreatment Order required, among other things, that the respondents to the order, Bay Harbor Company, Boyne, Bay Harbor Golf Club, CMS Land and CMS Capital, build a new pre-treatment facility to neutralize the pH of the highly alkaline CKD leachate that entered the Petoskey wastewater sewage and treatment system, and to remove solids precipitation.

23. In an agreement dated January 13, 2003, Bay Harbor Company conveyed to CMS Energy and CMS Land a non-exclusive easement for land that was to include facilities to collect leachate-contaminated groundwater and surface water, a pre-treatment facility, and a pipeline that was to transport pre-treated water containing leachate to the City of Petoskey's wastewater treatment plant. CMS Energy and CMS Land agreed to construct and operate the groundwater collection and treatment system and pipeline, make repairs as needed, and comply with all applicable permits.

24. CMS Energy, CMS Capital, and CMS Land designed, constructed, and operated the collection facilities, pretreatment system, and pipeline pursuant to the January 2003 agreement. However, because of continued exceedances of contaminants in the leachate transported to the City of Petoskey's wastewater treatment plant and other problems associated with the transportation of the leachate to the plant, the City of Petoskey stopped accepting the

pretreated leachate at its wastewater treatment plant in January 2004. At or about the same time, CMS Energy, CMS Capital, and CMS Land terminated use of the leachate collection and pretreatment system. Leachate containing CKD material that had been captured by the CMS collection system was released from that system and migrated across terrain and settled in pools at or near to the shoreline and migrated into Lake Michigan.

25. MDEQ representatives conducted visits to the Site in August and September 2004. They observed reddish-brown liquid seeping out along two sections of the shoreline ("seeps") at the Little Traverse Bay in the vicinity of at least two of the CKD piles in the western portion of the Site. Samples taken on behalf of MDEQ were highly alkaline; pH levels of pools containing the leachate located at the shoreline of the Bay measured as high as 13.2 on the pH scale. Water in portions of the Little Traverse Bay was discolored and pH samples of the Bay water detected highly alkaline conditions.

26. Starting on September 7, 2004, the City of Petoskey allowed CMS Energy and CMS Land to resume the discharge of CKD leachate to the City's wastewater treatment plant, provided, among other things, that CMS Energy and CMS Land finance a treatment optimization study of solids, mercury, and arsenic to be conducted by consultants for the City. The study was to recommend a response action to address those pollutant parameters together with a schedule for implementation.

27. EPA began investigating the discharge of CKD leachate from the seeps into the Little Traverse Bay on September 30, 2004.

28. On January 11, 2005, MDEQ memorialized an agreement with EPA that provided that EPA would take the lead in negotiating an enforceable agreement with potentially responsible parties for the implementation of interim measures to address the high pH conditions

on the beach at the Site and Lake Michigan. The enforceable agreement with the potentially responsible parties was to include a requirement to prepare a remedial investigation in order to select long term response activities for the Site. The agreement between EPA and MDEQ also provided that MDEQ would have the lead responsibility for determining what long-term response activities would be required at the Site as well as the scope, schedule of construction, and performance of those activities. The long-term response activities selected by the MDEQ would include, among other things, the integration of the interim response activities supervised by EPA, activities to isolate and prevent unacceptable exposure to the CKD material, and actions to prevent new releases of ground or surface water containing CKD material.

29.     On February 22, 2005, CMS Land, CMS Capital, and Bay Harbor Company ("Removal Action AOC Respondents") entered into an Administrative Order on Consent for Removal Action ("Removal Action AOC") with EPA to perform removal activities at the Site. EPA determined, as set forth in the Removal Action AOC, that conditions at the Site constituted a threat to public health, welfare, or the environment, based on the factors set forth in Section 300.415(b)(2) of the National Contingency Plan, 40 C.F.R. § 300.415(b)(2).

30.     The Removal Action AOC required CMS Land and CMS Capital to secure the areas then known to be CKD leachate release areas; investigate and evaluate other areas as possible CKD leachate release areas; recover all high-pH leachate from the CKD piles for treatment, storage, and disposal; design, construct, and operate CKD leachate recovery systems; monitor the effectiveness of the removal action activities, as well as pH leachate and hazardous substances which may continue to be released to the Little Traverse Bay; and conduct a remedial investigation and an evaluation of long-term remedies to respond to the releases of hazardous substances at the Site. Additionally, the Removal Action AOC required CMS Land and CMS

Capital to pay EPA up to $500,000 of "Future Response Costs," as defined therein, that the United States incurred in implementing, overseeing, or enforcing the Removal Action AOC.

31. On June 28, 2006, EPA issued an Action Memorandum, in which it documented and reiterated the existence of imminent and substantial threats to public health, welfare, and the environment and that a time-critical removal action was necessary to mitigate threats to public health, welfare, and the environment as set forth in the Removal Action AOC.

32. In December 2010, in accordance with the Removal Action AOC, contractors for CMS Land and CMS Capital submitted to EPA separate Removal Action Investigation/Remedial Investigation Reports and Alternatives Evaluations Reports for the Western CKD area and the Eastern CKD area at the Site. EPA approved the report for the Eastern CKD area in April 2011 and the report for the Western CKD area in May 2011.

33. Pursuant to its agreement with EPA, and consistent with the Removal Action AOC, MDEQ evaluated the reports referenced in Paragraph 32 and negotiated for an agreement with CMS Land and CMS Capital that would result in the selection and agreement to implement long-term remedial solutions for the Site.

34. On October 28, 2011, MDEQ submitted a draft to EPA of a proposed agreement between the State of Michigan and CMS Land and CMS Capital that (i) identified the long-term remedial measures MDEQ proposed to select for the Site and (ii) required CMS Land and CMS Capital to implement those measures.

35. On March 13, 2012, EPA informed MDEQ that it did not object to the proposed agreement, noting that nothing in the agreement, or EPA's non-objection to the agreement, limited EPA's or the United States' power and authority to, among other matters, "take, direct, or order all actions necessary to protect public health, welfare or the environment or to prevent,

abate or minimize an actual or threatened release of hazardous substances, pollutants, or contaminants, or hazardous or solid waste on, at or from the Site."

36.     On June 14, 2012 – pursuant to the January 11, 2005 agreement between MDEQ and EPA – MDEQ, CMS Land, and CMS Capital entered into an agreement to perform the remedial action for the Site, described as "long-term measures" to remediate impacts to the shoreline and surface water from the releases of CKD and CKD-contaminated leachate at the Site (the "2012 MDEQ Agreement").  The 2012 MDEQ Agreement constituted MDEQ's formal selection of the remedial measures to be conducted at the Site.  These measures include the integration of existing controls and practices installed at the Site from the removal actions, institutional controls, such as groundwater use limitations and land and development restrictions, additional storm sewer improvements, measures to remove mercury from the leachate, additional improvements to further contain and isolate CKD-impacted groundwater, additional controls to prevent clean groundwater from migrating through CKD, and measures to further minimize the migration of CKD-impacted groundwater toward and into Lake Michigan.

37.     On November 1, 2012, in a letter to CMS Land, EPA concluded that the Removal Action AOC Respondents had completed the removal activities required under the Removal Action AOC, and that the notice of completion "in no way releases CMS or Bay Harbor Company from any potential future obligations to perform additional work to address the same, or other conditions at the Site."  The notice also did not release CMS Land, CMS Capital, or Bay Harbor Company from any payment obligation, including their potential liability for "costs incurred by EPA in reviewing or developing plans, reports, and other items pursuant to the [Removal Action AOC]; verifying the work; or otherwise implementing, overseeing, or

enforcing the [Removal Action AOC] to the extent that these costs exceed the amount paid by CMS under the Order."

## RESPONSE COSTS

38. CERCLA § 107, 42 U.S.C. § 9607, authorizes the United States to recover costs that it incurs in response to the release and threatened release of hazardous substances, to the extent such costs are not inconsistent with the National Contingency Plan ("NCP"), promulgated pursuant to Section 105 of CERCLA, 42 U.S.C. § 9605, and codified at 40 C.F.R. Part 300. The statute imposes liability for such costs on certain classes of potentially responsible parties ("PRPs"), including current owners and operators of a facility from which there has been a release of a hazardous substance, parties that owned or operated a facility at the time of disposal of a hazardous substance, and parties that arranged for disposal or treatment of a hazardous substance owned or possessed by such parties, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances.

39. The United States has incurred costs in connection with response actions at the Site. The United States has incurred more than $7.9 million in unreimbursed response costs associated with the Site. Those costs include, but are not limited to: (i) costs of actions to monitor, assess, and evaluate the release or threatened release of hazardous substances at the Site; (ii) costs of overseeing response activities at the Site performed pursuant to the Removal Action AOC; and (iii) costs of enforcement activities relating to the Site.

40. The above-referenced response costs incurred by the United States qualify as costs of "response" and "costs of removal or remedial action incurred by the United States Government" under CERCLA §§ 101(25) and 107(a)(4)(A), 42 U.S.C. §§ 9601(25) and 9607(a)(4)(A).

41. The United States incurred the above-referenced response costs in a manner not inconsistent with the NCP.

42. The United States will continue to incur response costs associated with the Site.

43. The Removal Action AOC Respondents have paid $500,000 in past response costs incurred by the United States pursuant to the Removal Action AOC. The amount of unreimbursed costs referenced above incorporates full credit for the cost reimbursement already paid by the Removal Action AOC Respondents.

44. The amounts recoverable in an action under CERCLA § 107(a)(4)(A), 42 U.S.C. § 9607(a)(4)(A), include statutory prejudgment interest on the response costs. Such interest accrues from the later of: (i) the date that payment of a specified amount is demanded in writing; or (ii) the date of the expenditure concerned.

45. On October 25, 2010, EPA issued demand letters to companies, including, but not limited to, Bay Harbor Company, Bay Harbor Golf Club, CMS Capital, and CMS Land seeking reimbursement of at least $6,608,953.83 in unreimbursed response costs expended by the United States up to and including August 31, 2010, plus interest.

ALLEGATIONS RELATING TO THE DEFENDANTS

46. Each of the Defendants is a "person," within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

47. The following are "facilities" within the meaning of CERCLA §§ 101(9) and 107(a), 42 U.S.C. §§ 9601(9) and 9607(a): (i) the Site and all portions of the Site; (ii) each leachate collection and/or treatment or pretreatment system located on the Site; (iii) the golf course property, including the underlying CKD materials and leachate; (iv) The East Park

property and the underlying CKD materials and leachate; (v) all roads within the Site in which CKD leachate flowed over or under the road, and all roads with CKD material underneath such roads; (vi) all sewer pipes or other pipelines that, at any time from 1994 to the present, transported CKD leachate within the Site or to a location outside of the Site; (vii) all areas within the Site at any time from 1994 to the present where the CKD leachate or CKD material has been deposited, stored, disposed of, placed, or otherwise come to be located; and (viii) contaminated areas of the Little Traverse Bay of Lake Michigan.

48. The CKD material at the Site and the CKD leachate contain and qualify as "hazardous substances," within the meaning of CERCLA §§ 101(14) and 107(a), 42 U.S.C. §§ 9601(14) and 9607(a).

Bay Harbor Company

49. From the time Bay Harbor Company commenced ownership of the entire Site in 1994 until at least 2006, hazardous CKD leachate leaked, leached, flowed, and/or discharged intermittently from the CKD piles to the shoreline at the Site and into Lake Michigan. Such flow of leachate constitutes "releases" and/or threats of releases within the meaning of CERCLA Section 101(22), 42 U.S.C. § 9601(22).

50. Bay Harbor Company has owned and/or operated the entire Site beginning in 1994, and, though it subsequently transferred portions of the Site, remains the owner and/or operator of other portions of the Site. Currently, Bay Harbor Company owns property within the Site, including the roads at the Site where CKD material was placed and used for grading, the property on which a leachate collection, pretreatment system, and pipeline transporting CKD leachate to the City of Petoskey's wastewater treatment plant was located, and other property and open spaces at the Site.

51. In January 2003, Bay Harbor Company entered into the agreement with CMS Energy and CMS Land for treatment and disposal of CKD leachate from the Site, as described in Paragraph 23 above. That agreement and arrangement constituted an arrangement by Bay Harbor Company for the disposal or treatment of hazardous substances owned or possessed by such person, at a facility owned or operated by another party or entity and containing such hazardous substance, within the meaning of CERCLA Section 107(a)(3), 42 U.S.C. § 9607(a)(3).

52. From January 2004 until September 2004, the leachate collection and pretreatment facility described in Paragraphs 23-24, above, located upon property owned at the time and at present by Bay Harbor Company, ceased operating. The actions and failures to act of CMS Energy, CMS Land, CMS Capital, and Bay Harbor Company during this period resulted in the discharging, spilling, and/or leaking of hazardous CKD leachate over land located at the Site through the shoreline, and into Lake Michigan, which constitutes "disposal" within the meaning of CERCLA Sections 101(29) and 107(a), 42 U.S.C. §§ 9601(29) and 9607(a).

53. Upon information and belief, in connection with the construction of East Park and roads at the Site beginning in 1994, Bay Harbor Company moved and reshaped CKD material within the CKD piles and moved CKD material to other locations. These actions of moving and reshaping CKD material within the piles and moving the material to other locations, including locations where CKD material did not previously exist, constitute "disposal" within the meaning of CERCLA Sections 101(29) and 107(a), 42 U.S.C. §§ 9601(29) and 9607(a).

54. Bay Harbor Company therefore: (i) owns and/or operates facilities within the Site from which there have been releases and/or threats of releases of hazardous substances; (ii) owned and/or operated facilities at the Site at the time of disposal of hazardous substances at

those facilities; and (iii) arranged for disposal or treatment of hazardous substances that it owned or possessed, or that were owned or possessed by another party or entity.

55. In light of the foregoing, Bay Harbor Company is liable to the United States in this action under: (i) CERCLA § 107(a)(1), 42 U.S.C. § 9607(a)(1); (ii) CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2); and (iii) CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3).

<u>Bay Harbor Golf Club</u>

56. Bay Harbor Golf Club is currently the owner and operator of the portion of the Site encompassing the golf course and has owned and operated the golf course property since September 19, 1995. From the time Bay Harbor Golf Club began its ownership and operation of the golf course property until at least 2006, hazardous CKD leachate flowed intermittently from CKD piles at the golf course property to the shoreline at the Site and into Lake Michigan.

57. From January 2004 until September 2004, the leachate collection and pretreatment facility described in Paragraphs 23-24, above, ceased operating, resulting in the flow of hazardous CKD leachate from the golf course property, owned and operated by Bay Harbor Golf Club at the time, through the shoreline, and into Lake Michigan. This flow of hazardous leachate resulted in the discharging, spilling, and/or leaking of hazardous CKD leachate, which constitutes "releases" and/or threats of releases within the meaning of CERCLA Section 101(22), 42 U.S.C. § 9601(22), and "disposal" within the meaning of CERCLA Sections 101(29) and 107(a), 42 U.S.C. §§ 9601(29) and 9607(a).

58. Upon information and belief, in connection with the construction of the golf course and East Park beginning in 1994, Bay Harbor Golf Club moved and reshaped CKD material within the CKD piles and moved CKD material from one CKD pile to another. These actions of moving and reshaping CKD material within the piles and moving the material from

one CKD pile to another constitute "disposal" within the meaning of CERCLA Sections 101(29) and 107(a), 42 U.S.C. §§ 9601(29) and 9607(a).

59.	Bay Harbor Golf Club therefore: (i) owns and/or operates facilities within the Site from which there have been releases and/or threats of releases of hazardous substances; and (ii) owned and/or operated facilities at the Site, specifically the golf course property, at the time of disposal of hazardous substances at those facilities.

60.	In light of the foregoing, Bay Harbor Golf Club is liable to the United States in this action under: (i) CERCLA § 107(a)(1), 42 U.S.C. § 9607(a)(1); and (ii) CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2).

CMS Land, CMS Capital, and CMS Energy

61.	Upon information and belief, during or around 1994, CMS Land, CMS Capital, and/or CMS Energy entered into an agreement with Bay Harbor Company, Bay Harbor Golf Club and other entities, to the effect that the CMS entities will be responsible for all actions required by agreement or by law regarding the collection, treatment, transportation, and/or disposal of CKD leachate at the Site, including those responsibilities set forth in the MDNR-AA, described in Paragraph 15, above.

62.	In accordance with the January 2003 agreement between CMS Land, CMS Energy, and Bay Harbor Company described in Paragraph 23, above, CMS Land, CMS Capital, and CMS Energy constructed, owned, and/or operated the CKD leachate collection and pretreatment facilities and the pipeline described in Paragraphs 23 and 24, above. That agreement and arrangement constituted an arrangement by CMS Land, CMS Capital, and CMS Energy for the disposal or treatment of hazardous substances owned or possessed by such

16

person, at a facility owner or operated by another party or entity and containing such hazardous substance, within the meaning of CERCLA Section 107(a)(3), 42 U.S.C. § 9607(a)(3).

63. From January 2004 until September 2004, CMS Land, CMS Capital, and CMS Energy caused the leachate collection and pretreatment facilities and the pipeline, described in Paragraphs 23 and 24, above, to cease operating. The actions and/or failures to act of CMS Land, CMS Capital and CMS Energy during this period resulted in the discharging, spilling, and/or leaking of hazardous CKD leachate over land located at the Site through the shoreline, and into Lake Michigan, which constitute "releases" and/or threats of releases within the meaning of CERCLA Section 101(22), 42 U.S.C. § 9601(22), and the "disposal" of hazardous CKD leachate within the meaning of CERCLA Sections 101(29) and 107(a), 42 U.S.C. §§ 9601(29) and 9607(a).

64. Therefore, CMS Land, CMS Capital, and CMS Energy each: (i) owns and/or operates facilities within the Site from which there have been releases and/or threats of releases of hazardous substances; (ii) owned and/or operated facilities at the Site, namely the collection and pretreatment facilities and the pipeline, at the time of disposal of hazardous substances at those facilities; and (iii) arranged for disposal or treatment of hazardous substances that it owned or possessed, or that were owned or possessed by another party or entity.

65. In light of the foregoing, CMS Land, CMS Capital, and/or CMS Energy are liable to the United States in this action under: (i) CERCLA § 107(a)(1), 42 U.S.C. § 9607(a)(1); (ii) CERCLA § 107(a)(2), 42 U.S.C. § 9607(a)(2); and (iii) CERCLA § 107(a)(3), 42 U.S.C. § 9607(a)(3).

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (Cost Recovery by the United States Under CERCLA Section 107, 42 U.S.C. § 107)

66.  Paragraphs 1-65 are realleged and incorporated herein by reference.

67.  Each of the Defendants is jointly and severally liable to the United States for all unreimbursed response costs incurred by the United States in connection with the Site pursuant to CERCLA Section 107(a), 42 U.S.C. § 9607(a).

### SECOND CLAIM FOR RELIEF
### (Declaratory Judgment for Recovery of Further Response Costs by the United States)

68.  Paragraphs 1-65 are realleged and incorporated herein by reference.

69.  Each of the Defendants is liable to the United States for any unreimbursed further response costs that the United States incurs in connection with CKD material or CKD leachate contamination at the Site, not inconsistent with the NCP, pursuant to CERCLA §§ 107(a) and 113(g)(2), 42 U.S.C. §§ 9607(a) and 9613(g)(2), and the Declaratory Judgment Act, 28 U.S.C. § 2201-2202.

### PRAYER FOR RELIEF

Wherefore, Plaintiff, the United States of America, respectfully requests that this Court:

A.  Enter judgment in favor of the United States and against the above-named Defendants, jointly and severally, for all response costs incurred by the United States, as well as prejudgment interest, for response actions in connection with the Site;

B.  Enter a declaratory judgment in favor of the United States and against the above-named Defendants, for any unreimbursed further response costs that the United States incurs in connection with the Site, not inconsistent with the NCP;

C.        Award the United States with its costs of this action; and

D.        Grant the United States such other relief as the Court deems just and proper.

Respectfully submitted,

/s/
JOHN C. CRUDEN
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice


/s/
STEVEN D. ELLIS
Senior Counsel
Environmental Enforcement Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 514-3163
steven.ellis@usdoj.gov


PATRICK A. MILES, JR.
United States Attorney
Western District of Michigan


/s/
ADAM B. TOWNSHEND
Assistant U.S. Attorney
U.S. Attorney's Office, Western District of Michigan
330 Ionia Ave. NW, Suite 501
Grand Rapids, MI 49503
(616) 808-2130
(616) 456-2510 (fax)

OF COUNSEL:

CHRISTINE LISZEWSKI
Associate Regional Counsel
U.S. Environmental Protection Agency - Region 5
77 W. Jackson Blvd. (C-14J)
Chicago, Illinois  60604